Argued March 5, decided April 28, rehearing denied October 6, 1908.

## WILLIAMS v. ALTNOW.

[95 Pac. 200; 97 Pac. 539.]

WATERS AND WATER COURSES—USE FOR IRRIGATION—UNAUTHORIZED USES—REMEDY—EQUITABLE RELIEF.

1. In an action to restrain the maintenance of a dam and a reservoir and the diversion by an upper riparian owner on a nonnavigable stream of water used for irrigation purposes, the proof showed that prior to the construction of the dam and reservoir there was no controversy between the upper and lower riparian owners over the water, and also that all the riparian owners had all the water they needed, but that the dam and reservoir cut off the flow of water for about 10 or 15 days while the reservoir was being filled, during which time the lower owners were deprived of the use of water when it was needed by them. The construction of the dam was not only for the purpose of impounding water for the use on the land upon which it had been used by a prior appropriation, but was also for the purpose of reaching high bench land which could not be otherwise irrigated, and for which the owner of the dam was not entitled to use the water because of intervening appropriations by lower riparian owners. *Held*, that the construction of the dam and impounding of the water, together with the assertion by the owner of the dam of the right to use it on the bench land, was a threatened injury to the lower riparian owners which, with the fact that it caused an actual shortage of the water received by them, was sufficient to entitle them to resort to equity for relief, and to have the rights of each of them as well as the rights of the owner of the dam adjudicated.

SAME—PROPER PARTIES TO PROCEEDING.

2. In an action to restrain the maintenance of a dam and reservoir brought to settle the rights of different riparian owners in the water of a non-

navigable stream, the fact that some of the parties plaintiffs were not shown to have been injured by the maintenance of the dam, and that some of the parties defendant had not interfered with plaintiffs' rights, did not affect the right to maintain the action, since it was necessary, in order to determine the rights' of the parties, which involved the entire water of the stream, that all the parties having rights therein should be made parties, and it was immaterial whether they were made plaintiffs or defendants.

SAME—APPROPRIATION OF WATER RIGHTS—EXTENT.

3. Section 1 of the desert land act [Act March 3, 1877, c. 107, 19 Stat. 377 (U. S. Comp. St. 1901, p. 1548) 6 Fed. St. Ann. 393] provides that a claimant's right to water for irrigation and reclamation must depend upon a *bona fide* prior appropriation, but does not require that the appropriation should be from one stream or source of supply, or deny to a settler the right to use on his claim water to which he has a *bona fide* right by prior appropriation from any source. An owner of land consisting of two tracts, one of which was his brother's preemption which had been transferred to him, and the other a claim taken by him under the desert land act, made an appropriation prior to appropriation by any other person of certain water of a stream, the head of which was on his brother's preemption. *Held*, that the appropriation entitled the appropriator to a sufficient amount of water to irrigate the land to which the appropriation was intended to be applied at the time of the appropriation, whether it was on the desert land claim or the preemption, and hence it was error to confine his rights by the appropriation to the preemption.

SAME—SUBSEQUENT APPROPRIATIONS—EFFECT.

4. A person who, with intent to put water to some beneficial use, diverts it from a stream or other natural source of supply, and makes an application thereof within a reasonable time, has a prior right to use a sufficient quantity of water so diverted to supply his needs, not to exceed the amount of his appropriation, superior to the right of subsequent appropriators.

SAME—DIVERSION OF WATER—CHANGE OF POINT OF DIVERSION—
CHANGE OF PLACE OF USE.

5. A prior appropriator of water for a beneficial use from a stream or other natural source of supply, may change the point of diversion or the place of use so long as it does not prejudice the rights of subsequent claimants.

SAME—RIGHTS OF SUBSEQUENT APPROPRIATOR.

6. After the needs of a prior appropriator of water for a beneficial use, as measured by his original appropriation, have been supplied, or when the water is not actually required or used by him, it is at the disposal of other and subsequent appropriators according to their respective rights, and the prior appropriator must permit it to flow down to them as it is wont to flow.

SAME—RIPARIAN PROPRIETOR—RIGHTS.

7. Every riparian proprietor on a nonnavigable stream is entitled to a reasonable use of the water of the stream flowing through his land, and after the natural wants of all the other riparian proprietors have been supplied he may use their corresponding rights.

SAME—PRIORITIES BETWEEN—EFFECT OF PLACE OF LOCATION—EFFECT
OF DATE OF ACQUIRING TITLE.

8. There is no priority between the rights of riparian proprietors to the use of water of a nonnavigable stream, but their rights are equal, regardless of location on the stream, or the date of acquiring their title.

SAME—RIGHTS IN NONNAVIGABLE STREAMS.

9. A riparian owner has no title to the water of a nonnavigable stream flowing over his land, but only the right to use it while it is passing his place.

which right is subordinate to a corresponding right in all the other riparian proprietors.

SAME—DETERMINATION OF NATURE AND EXTENT OF RIGHT.

10. The nature and extent of the right of a riparian proprietor to the water of a stream for irrigation cannot be measured by any definite or fixed rule, nor can the amount of water which he is entitled to use for that purpose ordinarily be definitely determined ; it being necessarily a varying quantity depending upon the use by other proprietors, and whether its use by him will be an injury to them.

SAME—RIGHTS OF APPROPRIATORS.

11. An appropriator from a stream flowing through his premises has not the right to the use of a surplus for irrigation as against subsequent claimants

SAME—RIGHTS OF RIPARIAN PROPRIETORS—ELECTION—NECESSITY.

12. While the doctrines of prior appropriation and riparian rights are not so antagonistic that they may not exist in the same locality, a settler upon a nonnavigable stream has an election either to rely upon his rights as riparian proprietor or to make an appropriation of the water if it is free and subject to appropriation, and claim as an appropriator; but he cannot do both.

SAME—DECREE—REQUIREMENTS OF.

13. In an action by lower riparian owners of a nonnavigable stream against an upper owner to restrain the maintenance of a dam and reservoir and the diversion and impounding of water to the injury of plaintiffs, the evidence showed that plaintiffs were entitled to equitable relief against the impounding of the water in the reservoir, but did not show that the dam could not be maintained and operated in such a manner as not to injure the plaintiffs. *Held*, that a decree would be rendered restraining defendant from using any water from the reservoir in violation of the rights of other riparian owners when it was needed by them, but would not require the removal of the dam.

WATERS AND WATER COURSES — APPROPRIATION FOR IRRIGATION — CHANGE OF USE.

14. An appropriator of water from a stream for irrigation of land on one side of it cannot, as against subsequent appropriators, use his appropriation for irrigating land on the other side of the stream.

From Harney : GEORGE E. DAVIS, Judge.

Statement by MR. CHIEF JUSTICE BEAN.

This is a controversy between the settlers in Otis Valley over the waters of Otis Creek and its tributaries. Otis Creek arises in the Blue Mountains, flows in a general southerly direction for a distance of 10 to 15 miles, and discharges into the Malheur River. Warm Springs Creek and Cottonwood Creek are tributaries of Otis Creek from the east. The former discharges into the main stream about three miles from its mouth, and the latter about a mile and a half farther up. Plaintiff Pacific Live Stock Co. owns 400 acres of land at the junction of Otis Creek with the Malheur River, about 140

acres of which lies north of the river, and the remainder
south.   Plaintiff Marks is the owner of 320 acres lying
east of the property of the live stock company.  Plaintiff
Williams is the owner of 400 acres north of that belong-
ing to the live stock company, and extending up Otis
Creek about one and a quarter miles, and plaintiff
Stewart is the owner of 160 acres situated above that of
Williams.   Defendant Stallard owns 480 acres, 320 of
which lies in 40-acre tracts along Otis Creek, extending
from the mouth of Cottonwood Creek down to about three
quarters of a mile below the mouth of Warm Springs
Creek.    Defendant Robbins owns 80 acres east of the
lower part of Stallard's land, and defendant Altnow is
the owner of 400 acres at the head of Warm Springs
Creek, about a mile and a half above its mouth.  Warm
Springs Creek is the outflow of perennial springs on Alt-
now's land, which furnishes a continuous flow of several
hundred inches, and is the principal supply for irrigation
after the 15th of June of each year, as Otis Creek and
its tributaries above the mouth of Warm Springs Creek
becomes dry about that time.   All the land belonging to
the several parties is arid and requires irrigation for cul-
tivation.   Otis Creek or its tributaries flow through some
part of the land belonging to each of the parties to this
litigation except Marks, and his land is on the Malheur.
River a short distance below the mouth of Otis Creek.
Prior to 1903 there was water enough for the use of all
the parties, and there had been no controversy between
them concerning their respective rights; but in that year
defendant Altnow constructed a dam 775 feet long and
20 feet high across the channel of Warm Springs Creek
just below the springs from which it receives its supply,
thereby creating a reservoir 17 acres in area, and with
a capacity of 170 acre feet for the purpose of impound-
ing water to be used in irrigating lands belonging to him
on the opposite side of the creek from where he has been
previously using water.   Plaintiffs, insisting that the

construction of this dam, the impounding of water, and the threatened use thereof will interfere with their rights, brought this suit to enjoin and restrain him from maintaining such dam, or interfering with their use of the water, making Stallard and Robbins parties.

The complaint alleges that plaintiffs and their respective grantors and predecessors in interest have been the owners and in possession of the lands now owned by them since the 1st day of June, 1883, and have ever since that time had the lands inclosed and in cultivation, and that such lands are all riparian to Otis Creek; that July 10, 1883, while Otis Creek and its tributaries was a public stream flowing through the public lands of the United States, and the waters thereof free and unappropriated, the grantors and predecessors in interest of plaintiffs Williams, Marks, and the live stock company, entered upon the channels of the stream at a point on the public domain above their lands, erected a dam, and constructed a ditch of sufficient capacity to convey 400 inches of water for the purpose of irrigating the lands belonging to them, and have ever since, by means of such ditch, diverted water to the full extent of their appropriation to and upon their lands for irrigation, stock, and domestic purposes; that in the month of July, 1883, the grantors and predecessors in interest of plaintiffs Williams and Stewart, for the purpose of securing water to irrigate their lands, entered upon the channel of the creek above the dam referred to, constructed another dam, and dug a ditch to, across and over their lands, and appropriated through such ditch 150 inches of water, which they have ever since used for irrigation, stock and domestic purposes; that the two appropriations referred to were prior in time and superior in right to any and all appropriations of defendants or either of them, and to the right of any and all other persons whatsoever; that during the last five years, and particularly during the years 1902-03, defendants, at different points above the intake of the two

ditches referred to, have entered upon the channels of the creek and its tributaries, placed dams and obstructions therein, and by means of ditches have turned out the water naturally flowing therein, while plaintiffs needed the same for irrigation, to their damage and in violation of their rights as prior appropriators. A decree was prayed for establishing plaintiffs' prior and superior right to 400 inches of water through the ditch first constructed, and 150 inches through the second ditch; that defendants be perpetually enjoined from diverting any water from the creek or its tributaries until the amount of plaintiffs' appropriation shall have been first supplied; and that they be required to remove their dams and obstructions from the creek and its tributaries, and to permit a continuous flow of water down the stream to the extent and in amount sufficient to supply plaintiffs' rights.

Defendant Altnow answered, denying the allegations of the complaint, and alleging affirmatively that Warm Springs Creek flows through his lands, which have been in the ownership and possession of himself and predecessors in interest since the 25th of September, 1883, and the waters thereof have since that time been used for irrigation, stock and domestic purposes by right of riparian ownership; that early in the summer of 1883 he built a dam across the creek upon his land, and by means of ditches diverted all the water therefrom and used the same for irrigation, stock and domestic purposes, and that at the time of his appropriation the stream was wholly upon government land, and none of the waters thereof had been appropriated or were being, or had been, used by any other person; that it requires the use of 300 inches of water under six inch pressure during the irrigation season to properly irrigate the lands belonging to him and for domestic and stock use; that he has so used the water continuously during the whole of each irrigation season, and has had actual, open

and adverse possession and use of such water and springs, and of the whole thereof, since that date; that at the time he constructed the first dam across the stream and began to use the water he was unable, financially, to construct such dam and ditches as were really necessary in order to make the most effective use of the waters, and during the last few years he has constructed a larger dam across the stream, and by means of ditches connected the same with his system of irrigation at an expense of about $3,000. He further alleges that in the years 1884-85 he and one John Robertson constructed a dam across Cottonwood Creek, and from thence a ditch to and upon the land owned by him, and thereby diverted about 600 inches of water under six inch pressure, two thirds of which belonged to him and which he has continuously used for irrigation purposes. Defendant Stallard for his answer alleges that for more than 15 years last past he has been the owner and in possession of certain described land riparian to Otis and Warm Springs Creeks, and 320 acres thereof has been subject to private ownership since the 8th day of October, 1883; that in 1885 his predecessors in interest built a dam across Warm Springs Creek some distance above his land, and by means of a ditch diverted 150 inches of water, which was conveyed to and upon his land and used for necessary irrigation, stock and domestic purposes, and has been continuously used each and every irrigation season since the date of diversion; that in 1887 he constructed another dam across Otis Creek and diverted 100 inches of water, which he has ever since used for irrigation purposes. The separate answer of Robbins alleges that for more than 15 years last past he and his predecessors in interest have been the owners and in possession of certain lands through which Warm Springs Creek flows; that in the year 1885 his predecessor in interest constructed a dam in Warm Springs Creek some distance above his lands, and by means of a ditch diverted about

200 inches of water, 50 of which was then and ever since has been used in the irrigation of his land, and was diverted for that purpose.

The reply put in issue the new matter of their answers, and for further defense avers that Altnow ought not be permitted to plead that he is riparian proprietor on Warm Springs Creek as to 240 acres of land owned by him, for he acquired title thereto through the desert land act of March 3, 1877, c. 107, § 1, 19 Stat. 377 (U. S. Comp. St. 1901, p. 1548), and claimed water from Cottonwood Creek for the reclamation thereof.

After the testimony had been taken the court below made findings of fact and conclusions of law to the effect that defendant Altnow was the first appropriator, and is prior in right to a quantity of water from Warm Springs Creek equal to a flow of $1\frac{7}{8}$ second feet or 75 inches, which he is entitled to use for the irrigation of his lands at all times, provided he uses it in such a manner as not to reduce the flow of water at the head of plaintiffs' ditches to an amount less than it would be if he used it in irrigation of the lands heretofore irrigated on the east side of the creek; that plaintiffs Williams, Marks and the live stock company have second right to the use of water through the Duncan ditch, on the east side of Otis Creek, to the extent of 150 inches, measured under six inch pressure, miners' measurement, or $3\frac{3}{4}$ second feet; that plaintiffs S. B. Stewart and S. S. Williams are third in time and right to the extent of 50 inches or $1\frac{1}{4}$ second feet of the waters at the head of their ditch; that defendants Stallard and Robbins are equal in point of time and diversion, and are fourth in right to the waters of the creek to the extent of 150 inches or $3\frac{3}{4}$ second feet, miners' measurement; that after the appropriations above specified have been supplied, defendant Altnow is entitled to all the remainder of the waters in the stream, which he may use in any manner he may choose, except that he must not impound and let it go in sufficient quan-

tities to injure the lower proprietors; and that none of
the parties are entitled to complain of the appropriations
and use of the waters of the stream by others prior to
May 15th of each year.  A decree was entered accord-
ingly, from which all parties appeal.          MODIFIED.

For appellant there was a brief with oral arguments
by *Mr. Lionel R. Webster* and *Mr. Robert Shaw.*

For respondent there was a brief over the names of
*Mr. Will R. King,** William H. Brooke* and *John L. Rand,*
with oral arguments by *Mr. Brooke* and *Mr. Rand.*

MR. CHIEF JUSTICE BEAN delivered the opinion.

Plaintiffs' claim to the waters of Otis Creek is based
upon appropriations through two ditches, one known and
designated in the record as the "Stewart ditch," taken
out on the west side of the creek near the south line of
defendant Stallard's land and below the mouth of Warm
Springs Creek, and the other, the "Duncan ditch," taken
out lower on the east side.  The Stewart ditch is about
1½ miles long, and supplies water for irrigating the lands
of plaintiff Stewart, and part of the land belonging to
plaintiff Williams.  The Duncan ditch is 3½ miles long,
and land belonging to plaintiffs Williams, Marks and the
live stock company are under it.  Defendant Altnow
claims a right to the waters of the Warm Springs Creek
prior in time to that of the plaintiffs by reason of an
appropriation alleged to have been made in 1883, and
as riparian proprietor.

Before considering the legal rights involved, it is im-
portant to ascertain the date of settlement and title of
the parties and their predecessors in interest, the time
of the construction of the several ditches, and the amount
of land under each ditch which is entitled to water there-
from for irrigation.

Stewart's Land.    The land owned by plaintiff Stewart,
which is nearest the head of the Stewart ditch, was occu-

---

* Mr. Commissioner King having been of counsel, did not sit in thi s case.

pied by one Prime in 1883. Prime died a short time thereafter, and on October 29, 1884, his widow filed on the same as a homestead, alleging settlement October 15th of that year. In 1887 she relinquished her filing, sold her improvements, including all water rights, to plaintiff Stewart, who filed on the land as a soldier's homestead, and afterward obtained title.

Williams' Land. The 160 acres adjoining the Stewart farm on the south were settled upon by Albert Gittings and F. M. Gibler, and the north half thereof was filed on by Gittings as a timber culture claim April 18, 1885, and the south half by Gibler January 27th of the same year. Both these filings were subsequently relinquished, and the land filed on February 26, 1895, by James A. Gittings, who also relinquished his filing, and it was again filed on April 18, 1898, by Hyrum Williams, as a homestead, and patent was issued to him, and he afterwards deeded it to the present plaintiff Williams. South of the Gibler and Gittings tract are 160 acres filed upon by N. E. Duncan as a homestead May 29, 1884, patented to him November 2, 1891, and thereafter sold to H. A. Williams, father of the present plaintiff. East of the Duncan homestead are 80 acres, filed on by Duncan as a timber culture claim on September 24, 1885. He subsequently relinquished this filing and on October 13, 1896, it was filed on as a homestead by plaintiff Williams, and patent subsequently issued to him.

Pacific Live Stock Co.'s Land. South of the Duncan claim are 160 acres, filed on as a preemption by Albert Elliott December 12, 1883; alleged settlement October 1st of that year. The land was subsequently patented to Elliott, and by him conveyed to the live stock company. West of the Elliott tract are 120 acres, filed on by plaintiff Stewart as a preemption August 24, 1884, and subsequently deeded by him to the live stock company.

Marks' Land. Plaintiff Marks owns 320 acres east of that belonging to the live stock company. Of this, 160

acres were filed on by Madison Elliott as a preemption December 12, 1883; alleging settlement October 1st of that year. The land was subsequently patented to Elliott and by him conveyed to Marks. On the remaining 160 acres, 80 were filed on by Madison Elliott as timber culture claim October 6, 1884. The filing was subsequently relinquished by Elliott, and the land, together with the additional 80 acres, was filed on by Kenyon as a homestead January 30, 1891, and subsequently patented to him and conveyed to Marks.

Altnow's Land. Defendant Altnow is the owner of 400 acres of land at the head of Warm Springs Creek, some miles above the head of the Stewart and Duncan ditches. 240 acres of this land were filed on by him as a desert land claim September 25, 1883, and final proof made September 10, 1886. The remaining 160 acres were settled on by his brother, John Altnow, September 1, 1883, as a preemption, and filed on September 25th, and final proof made January 7, 1884. He afterwards received patent to the same, and conveyed to his brother, the defendant.

Stallard's Land. Defendant Stallard owns 480 acres above the head of the Stewart and Duncan ditches and below the land of his codefendant Altnow. 160 acres of this were filed on by him as a preemption in October, 1883, but changed to a homestead in October, 1885. 160 acres of the remainder were filed on by W. J. South as a homestead on May 28, 1888, and subsequently patented to South and conveyed by him to Stallard. The remainder was filed on by Thomas Delaney as a preemption October 25, 1883, and by him subsequently conveyed to Stallard.

Robbins' Land. Defendant Robbins owns 80 acres east of the lower part of Stallard's property, which were filed on as a preemption by Taylor on December 19, 1888, and subsequently patented to Taylor, and by him conveyed to Robbins.

Stewart's Ditch. On July 23, 1883, William Prime, who occupied the land now owned by plaintiff Stewart, filed and had recorded in the county records a notice, claiming 300 inches of water for irrigation purposes, to be taken out near the head of the present Stewart ditch. In October of that year Gibler settled on a tract of land below Prime, and Stewart settled two miles farther down on land now owned by the live stock company. They both testify that when they came to the country they saw Prime's water notice posted on a stake in the stream at the proposed point of diversion, and 12 or 15 feet of ditch had been dug. In the following spring Gittings, Gibler and Stewart joined with Prime in the completion of the ditch, and the water was turned in and used by them that season for irrigation. The ditch, as originally constructed, was 1½ or 2 miles long. Raleigh Stewart says it was 3 feet wide and 1½ feet deep, and Gibler that it was 3 feet wide and 2 or 2½ feet deep. Defendant Stallard, who has known the ditch from the time it was constructed, says it would carry as much water when first built as it now does, and Mr. Fox, a civil engineer, who measured it just before the commencement of this suit, testifies that the present capacity is 3.24 second feet or 162 inches. Water was used through this ditch by Prime, Gibler, Gittings and Stewart to irrigate garden and small fields of grain on their respective places in 1884, and the area of irrigable ground has been increased by them and their successors in interest from year to year since the construction of the ditch, except on Stewart's preemption, and no water has been used on it through the ditch since the live stock company acquired title thereto in 1887. The evidence is not clear as to the amount of land in cultivation under the ditch at the time this suit was commenced, or the quantity of water necessary for its successful irrigation. The court below found that 1¼ second feet or 50 inches were sufficient for that purpose, and this is probably as near the fact as can be ascertained from the evidence.

Duncan's Ditch. Duncan's notice of an intention to appropriate 400 inches of water for irrigation purposes was dated August 25, 1883, and filed August 30th of that year; but the plaintiffs claim that actual work was commenced on the ditch early in July preceding, while defendants contend that the first work was done in 1884, and the ditch was not completed until later. Upon this point the evidence is in much confusion, and consists principally of the testimony of witnesses concerning events which happened many years ago. It is therefore difficult to arrive at a satisfactory conclusion. Madison Elliott testifies that he settled on a tract of land now owned by plaintiff Marks, in 1883, and helped dig the Duncan ditch; that the survey for the ditch was begun the 10th of July, 1883, and work commenced by the 15th of that month, and that about two months' work for two men was done that year; that the ditch was completed to the Duncan place the next year, and water turned into it for irrigation purposes, and was entirely completed the succeeding year; that it was the intention of the parties constructing the ditch to appropriate water for the irrigation of all the land now under the ditch; that the principal reason the witness has for remembering the date is, that his child died on the 17th of July, 1883, and he first heard about it while he was working on the ditch. Gibler testifies that he came to the valley in October, 1883, looking for land, and that Duncan told him that there was a piece of land adjoining his which he could take up; that witness asked about water, and Duncan said he had a ditch already commenced on which he and the Elliotts had done some work, and if agreeable to them he (Gibler) could have an interest in it; that Gittings had 80 acres just above the land settled on by witness, and it was understood that he also was to have a one fifth interest in the ditch and the water flowing in it, and that Gittings did the work for himself and witness; that they constructed the ditch in 1884 to the Elliotts'

land, and they (Elliotts) raised a small crop and garden
that year; that he (witness) used no water through the
ditch for irrigation until 1885, when he irrigated 13 or
14 acres; and that he sold out in 1894 or 1895, and had
at that time 15 or 16 acres in cultivation.  Plaintiff
Stewart came to the valley in either September or Octo-
ber, 1883, and settled upon the land near the mouth of
Otis Creek.  The first work he saw done on the Duncan
ditch was in 1884, in June or July, and it was completed
to the Duncan place in 1885.  Raleigh and Charley Stew-
art first noticed the Duncan ditch in 1884, and in August
of that year saw Elliott and Duncan at work on it.  At
that time they had between a quarter and half a mile dug,
but no water had been turned in.  Defendant Stallard
testifies that he came to Otis Valley in 1883, and has lived
there ever since; that Duncan did not move on his place
to reside permanently until June or July, 1884, but built
a small cabin the fall before; that the survey of the Dun-
can ditch was made in August or September, 1884, and
some work done on it that year, but no water turned in;
that the ditch was completed to the Duncan place in 1885,
and to the Elliott place in 1887, and the first crops raised
by Duncan were in 1886.  W. Allen says that in 1885 he
was driving a band of stock through the country and
camped on Otis Creek below the Duncan place, and there
was no ditch there at that time, and he had to bring his
stock back to the creek for water.  Mrs. Gittings says
that she lived in the house or cabin built by Duncan dur-
ing the winter of 1883-84, and until the fall of 1884, and
no work had been done on the ditch that fall at the head,
and that Duncan boarded with her while he was working
on the ditch.  John Stemler testifies that he worked on
this ditch about a quarter of a mile below the head 14
days in April, 1885, and produced a memorandum book
in which he had account of his work, and that at that
time there was no ditch below the point where he was
working, and no water had been turned into the ditch.

There were other witnesses who testified that the ditch was not begun until late in the summer of 1884, and was not completed or water turned in until the next year. Allen, Robertson, Stallard, Mrs. Gittings and South testified positively that the ditch was not begun until that time. Madison Elliott and Gibler are the only witnesses who testify that the work was commenced in 1883. Elliott says it was begun that year and finished to the Duncan place the next. The relation of these events, one to the other, is no doubt correct, but Mrs. Gittings, Stallard, Stemler and others testify that the ditch did not reach the Duncan land until 1885, and it is quite probable that Elliott is mistaken one year in his dates. Gibler testifies that after he came to the country he asked Duncan about water, and Duncan told him he had commenced the construction of a ditch, and that if the Elliotts did not object he (Gibler) might have an interest therein, if he would help complete it. He is not very definite as to the date of this conversation, and in view of the fact that Duncan did not begin to reside on his land until the summer of 1884, and the further fact that Gibler's first use of the water was in 1885, it is quite reasonable that the conversation alluded to occurred in the fall of 1884, at which time all the witnesses agree that Duncan's ditch had been commenced. Upon the whole testimony we are of the opinion that the court below was right in finding that the Duncan ditch was not begun until 1884. It had a capacity at the time of its construction of 10 second feet, but has since widened and deepened by erosion until its present capacity is 17.4 second feet. The ditch was constructed and water diverted through it by Duncan, Gibler, Gittings and the two Elliotts for the purpose of irrigation, and Elliott testified that it was the intention of the parties to irrigate all the land now under the ditch. The court below found that by due diligence and within a reasonable time the original appropriators and their successors in interest had in cultivation only a sufficient

51 OR.—— 10

quantity of land to require the use of 3¾ second feet and limited the rights of the owners of the ditch to that quantity. This conclusion was reached on the ground that at the time of the appropriation the appropriators had no intention of using the water on the Duncan timber claim, the Gibler and Gittings land, or the Madison Elliott timber culture. Gibler and Gittings assisted in the construction of the ditch, and it was understood by the parties that they should each have a one fifth interest therein, and in 1885 water was used from it to irrigate part of their land, and no reason is suggested why such land should now be excluded. The Duncan and Elliott timber culture claims were not filed on for some time after the parties had made their filings on their pre-emption claims; but Elliott says it was the intention to use the water for irrigating all the land now under the ditch, and the ditch, as constructed, passed through both these claims, and it seems to us that there is a clear manifestation of an intention to use the water intended to be appropriated in irrigating land under the ditch on the timber claims. The appropriation was made in 1884, and from that time until 1903 water has been used through the ditch by the appropriators and their successors in interest, without objection, for the purpose of irrigating land on such claims, and before they should be deprived of the right to do so it ought clearly to appear that the water has been put to a use not originally contemplated, or more has been used than is necessary for the purpose for which it was appropriated. At the time of the appropriation Elliott was the only party interested in the ditch who had filed on any land. The filings of all the others were made subsequent thereto, and therefore the dates of such filings are not conclusive evidence of the purpose and intent of the parties making the appropriation. The amount of water to which the owners of the Duncan ditch are entitled should, we think, be increased from that allowed by the court below to an amount sufficient to irri-

gate the land under the ditch on the Gibler and Gittings claim and the Duncan and Elliott timber claim. No accurate measurement of the area of the cultivated land under the ditch seems to have been made, and no very definite estimate is given by any of the witnesses, but, as near as we can ascertain from the testimony, the amount should be increased 50 inches or $1\frac{1}{4}$ second feet.

Altnow Appropriation. Defendant Altnow owns 400 acres of land at the head of Warm Springs Creek, and above the intake of the Stewart and Duncan ditches; 160 acres of this were filed on as a pre-emption by his brother John Altnow in September, 1883, and after final proof it was conveyed to defendant. The remaining 240 acres were filed on the same day by defendant under the desert land act, and title subsequently acquired by him. Warm Springs Creek has its principal source of supply in a group of perpetual springs near the north line of the John Altnow pre-emption, and flows southwesterly through such pre-emption, and then diagonally through the desert claim of defendant. Defendant's house is on the John Altnow pre-emption. Near the house are two or three small springs, which form a reservoir or pond, from which a stream runs into the main stream a short distance below its head. The stage road, the principal thoroughfare of the country, runs practically north and south along the east side of defendant's land, and between it and the creek is a level tract which has been reduced to a state of cultivation, and is irrigated by water from the creek. The land on the west side of the stream is high bench land, and cannot be reached with water from the stream, except by raising it 20 or 30 feet by means of a dam. In the spring of 1883 defendant occupied the land afterwards taken by his brother as a pre-emption, and in July of that year built a small dam in the creek at the junction of the main stream and the one leading from the springs near his house, and constructed a ditch 2 or 3 feet wide and perhaps 12 or 14 inches deep,

through which he turned water onto the land between the stream and the stage road, to wash out the alkali and prepare it for cultivation. About the time he commenced work on the dam and ditch, or perhaps a short time afterwards, he filed for record in the county clerk's office a notice of an intention to appropriate 400 inches of water, to be taken out at or near the junction of the two channels referred to, for irrigation purposes. No crops were raised in 1883, but the water diverted was used to render the land fit for cultivation, and the next year a small area was actually cultivated. The capacity of the ditch and the amount of water diverted is difficult to ascertain from the testimony. Mr. Altnow says he took out all the water and distributed it over the land, intending to use it on both the Altnow pre-emption and his desert claim, and has since so used it. Mr. Allen, who seems to have been somewhat familiar with the situation, says that the defendant took out all the water he could. Mr. Drake, who assisted in building the dam and ditch, testifies that they turned out all the water from the stream into a slough, and that it ran back into the creek 200 rods below the dam, and he never saw defendant use any of the water; that afterwards the ditch was extended by some person, he does not remember whom. Mr. Fredericks testifies that in the fall of 1883 he and John Altnow worked on the ditch and dam, and "fixed it so it would hold all the water, and built the dam higher, and made it as tight as we could, and tried to get all the water out of the stream"; that the ditch where he worked was 8 or 10 rods long, and took the water out on the land between the creek and the stage road, and it was used for irrigating the natural grasses and preparing the land for future use; that he did not remember how much land was under the ditch, and did not pay any particular attention to it at the time, but there were about 80 acres under it in hay, timothy, alfalfa and different kinds of grain; that there is another ditch on the same side higher

up, and that it reaches the land not covered by the lower ditch; that he (witness) worked the same fall on another dam in the creek, 200 rods above the first, to raise the water so it could be taken out by a ditch and into the reservoir near the house. John Robertson says that he saw Altnow using water out of the ditch in July or August, 1883; that he was taking it out of a ditch at the lower fork of the stream, and spreading it out over some alkali land; that in the spring of 1884 Altnow constructed a dam or reservoir near the house, and has taken a ditch from it, carrying water on to his land; that he was using the water to irrigate about 125 acres in 1883, and which has since been extended to 160 or 170 acres; and that he has been irrigating that amount for 12 or 14 years. It thus appears that Mr. Altnow initiated an appropriation in July, 1883, but at that time did not own the land upon which he proposed to apply the water, nor does it appear that he at any time intended to acquire title to the land subsequently filed on by his brother; but the purpose of the appropriation in the beginning was to irrigate the land below the head of the ditch on the east side of the stream and lying between the creek and the stage road, and the first use made of the water was to wash out the alkali and prepare the land for cultivation. During the first year the water was used on a small part of the land, but work was continued and increased from year to year until practically all the land on the Altnow pre-emption and desert claim under the ditches has been put into a state of cultivation. Mr. Altnow says that there are now about 190 acres being irrigated from the water thus appropriated. Mr. Robertson places the amount from 160 to 170 acres, and Mr. Albert Altnow at about 150; but none of the witnesses segregate the land on the desert land claim, irrigated from the ditch, from that on the pre-emption. The evidence indicates that the acreage of irrigable land was increased from year to year until 15 or 16 years ago, when it was all

reduced to a state of cultivation, and there had been no increase in the amount of water used up to 1903, when defendant constructed the reservoir and a ditch leading therefrom for the purpose of using the water on the bench land west of the stream. The court below held, as we understand it, that the right to use the water appropriated by him was confined to the amount necessary to the beneficial use on the John Altnow pre-emption claim, being 1⅞ second feet.

Stallard's and Robbins' Rights. All of defendant Stallard's land, except 160 acres, is situated on Otis Creek above the mouth of Warm Springs Creek, and is not effected by this controversy. It is admitted that as long as there is any water running in Otis Creek above the mouth of Warm Springs Creek there is enough for the use of all parties. It is only after Otis Creek above that point becomes dry in the early summer that there is a shortage of water. The 160 acres referred to were filed on by Stallard as a homestead in October, 1885, and in that year he took out a ditch from Warm Springs Creek above his land, and diverted water for the irrigation of 120 acres, and has continued since to so use it. But his use did not in any way interfere with the rights of the plaintiffs until after the defendant Altnow constructed his dam at the head of the stream in 1903. In 1885 Robbins took out a ditch from Warm Springs Creek with which he has since irrigated about 30 acres of land, but his use has not interfered with the rights of plaintiffs.

1. Having thus ascertained the priority of the respective parties as nearly as we can from the evidence, it remains to consider briefly the legal questions involved. It is claimed at the outset that plaintiffs' complaint should be dismissed because there is no proof that their rights have been interfered with at any time. The evidence shows that prior to the year 1903 there was no controversy between the settlers in Otis Valley over the water of Otis Creek and the tributaries thereof, but in

that year defendant Altnow completed the construction of his dam at the head of Warm Springs Creek, cut off the flow of water for about 10 or 15 days, while the reservoir was being filled, during which time plaintiffs were deprived of the use of the water when it was needed by them. Mr. Patterson, who was in charge of the irrigation for plaintiff Williams, says that there was about half enough water in the Duncan ditch in that season to irrigate the land under it, and this shortage was caused by the Altnow dam. The construction of this dam was not only for the purpose of impounding the water for use on the east side of Otis Creek, where it had been used since the date of the original appropriation in 1883, but was for the purpose of reaching the high bench land on the west side of the creek which could not otherwise be irrigated. The construction of the dam and impounding of the water, together with the assertion of the right to use it on the bench land, was a threatened injury to the plaintiffs, and, together with the actual fact that there was a shortage of water in 1903, caused, as the witnesses testify, by the dam, is clearly sufficient to entitle plaintiffs to resort to a court of equity for relief, and to have the rights of all parties claiming an interest in the water of the stream adjudicated and determined.

2. It is true the evidence shows that there has been no shortage in the Stewart ditch, and that perhaps some of the defendants had not interfered with plaintiffs' rights; but since it was necessary for them to bring a suit against defendant Altnow to have their respective rights determined, and which necessarily involved the entire water of the stream, it is proper that the owners of the Stewart ditch and the other parties claiming rights in the stream should be made parties, and it is immaterial whether they joined as plaintiffs or defendants.

3. It is next insisted by defendant Altnow that the court below erred in finding that he only had a right to 1⅞ second feet or 75 inches of water as prior appro-

priator.   This conclusion seems to have been based on
the theory that he was not entitled to use the water or
any part of it for irrigating land on his desert claim, but
that his rights were confined to his land under the ditch
on the John Altnow pre-emption.   In this we think the
court erred.   Whether Altnow's appropriation dates from
July, 1883, the time the initial steps were taken, or from
September of that year, when his brother John filed on
the pre-emption, is immaterial.   In either event it is
prior in time and right to the appropriations made
through the Stewart and Duncan ditches, and to the
rights of defendants Stallard and Robbins, and gave to
Altnow and his predecessor in interest a prior right to a
sufficient amount of water to irrigate the land to which
it was intended to be applied at the time of the appropria-
tion, whether it was on the desert land claim or the pre-
emption.   By the desert land act, a claimant's right to
water for irrigation and reclamation must depend upon
a *bona fide* prior appropriation (Section 1, Act March 3,
1887, c. 107, 19 Stat. 377 [U. S. Comp. St. 1901, p. 1548]
6 Fed. St. Ann. p. 393), but there is nothing in the act
which requires that the appropriation should be from one
stream or source of supply, or which denies a settler the
right to use on such claim water to which he has a *bona
fide* right by prior appropriation from any source.   The
land on defendant Altnow's desert claim which he irri-
gates with water taken from the stream on the pre-
emption claim of his brother is not under the ditch from
Cottonwood Creek, and cannot be reached by it.   We
think it clear, therefore, that Altnow is entitled to the
first right to water sufficient to irrigate the land belong-
ing to him on the east side of the stream and under the
ditches, whether on the pre-emption or desert claim.

4.  And as there seems to be no substantial controversy
about the number of acres so irrigated, or the quantity
of water necessary for an acre, we conclude that the
amount of water to which he is entitled, when necessary

for irrigation purposes, is 3¾ second feet, or 150 inches. But he has the right to use the water only when necessary, and cannot be permitted to obstruct or retard the natural flow of the stream when the water is not so needed, by means of dams, reservoirs, or other obstructions to the injury of the lower proprietors. One who, with an intention to put water to some beneficial use, existing or contemplated, diverts it from a stream or other natural source of supply, and makes an application thereof within a reasonable time, has a prior right to use a sufficient quantity of water so diverted to supply his needs, not to exceed the amount of his appropriation, superior to the right of subsequent appropriators, locators or grantees.

5. And he may change the point of diversion or the place of use so long as it does not prejudice the rights of subsequent claimants: *Bolter* v. *Garrett,* 44 Or. 304 (75 Pac. 142) ; *McCall* v. *Porter,* 42 Or. 49 (70 Pac. 820, 71 Pac. 976) ; Long, Irrigation, § 50.

6. But his needs, as measured by his original appropriation, have been supplied, or, when the water is not actually required or used by him, it is at the disposition of others, according to their respective rights, and he must permit it to flow down to them as it is wont to flow: *Nevada Ditch Co.* v. *Bennett,* 30 Or. 59 (45 Pac. 472: 60 Am. St. Rep. 777) ; *Bolter* v. *Garrett,* 44 Or. 304 (75 Pac. 142) ; *Gardner* v. *Wright,* 49 Or. 609 (91 Pac. 286; *Mann* v. *Parker,* 48 Or. 321 (86 Pac. 598) ; *Mattis* v. *Hosmer,* 37 Or. 523 (62 Pac. 17, 632).

7. It is claimed that defendant Altnow is entitled to the use of water from Warm Springs Creek by right of prior appropriation, to the extent of his original appropriation, and to the surplus water in such stream, if any, as riparian proprietor, because the filing of his predecessor in interest was the first one made on the stream. There are several reasons why this position cannot be sustained. In the first place, in the opinion

of the writer, it is doubtful whether the owner of land
through which a non-navigable stream flows can claim
the right as riparian proprietor to use the waters thereof
for irrigation as against subsequent appropriators on the
stream below him.   And, again, it is a serious question
whether the desert land act does not abolish the so-called
modified doctrine of riparian rights, which gives to ri-
parian proprietors the right to use water for irrigation
as to all lands through which non-navigable streams flow,
the title to which has been acquired from the government
of the United States since the passage of that act.   It
declares that all surplus waters over and above that
appropriated by the desert land claimant, "together with
the waters of all lakes, rivers and other sources of water
supply upon the public lands and not navigable, shall re-
main and be held free for the appropriation and use of
the public for irrigation, mining and manufacturing pur-
poses, subject to existing rights."   The government of
the United States, as the primary owner of the soil, un-
doubtedly has the right to make such provisions concern-
ing the waters of non-navigable streams thereon as it
deemed proper, and it is at least a debatable question
whether, by the language quoted, Congress did not in-
tend to recognize and assent to the appropriation of such
waters in contravention to the common-law doctrine of
riparian rights as to persons subsequently acquiring title
from the United States: *United States* v. *Rio Grande Irr.
Co.* 174 U. S. 690 (19 Sup. Ct. 770: 43 L. Ed. 1136).   But
it is not necessary to decide either of the questions sug-
gested at this time.   Defendant Altnow, if he is entitled
to use any part of the waters of Warm Springs Creek as
riparian proprietor, has no right thereto superior to the
other parties to this litigation.   Otis Creek flows through
the land of all of them, and their rights, as riparian pro-
prietors, to the use of the waters, are equal, and one is
not superior to the other.   Every riparian proprietor is
entitled, as against other riparian proprietors, to a

reasonable use of the waters of a non-navigable stream flowing through his land, and after the natural wants of all have been supplied he may make a reasonable use of the surplus for irrigation purposes, when he can do so without infringing upon the corresponding rights of the other proprietors. *Jones* v. *Conn,* 39 Or. 30 (Pac. 855, 65 Pac. 1068: 54 L. R. A. 630: 87 Am. St. Rep. 634).

8. But in this respect the rights of all the riparian proprietors are equal, regardless of location on the stream, or date of acquiring title. There can be no priority of rights as between riparian proprietors. The right of the first settler is not superior to that of the last. No one riparian proprietor can use the water for irrigation to the prejudice or injury of the correlative rights of the others above or below him on the stream, unless he has some prior right to divert it or title to some exclusive enjoyment.

9. A riparian proprietor has no title to the water flowing over his land, but only the right to use it while it is passing his place, and this right is subordinate to a corresponding right in all the other proprietors. One proprietor cannot unreasonably detain or give the water another direction, or use it in any way to the injury of the others.

10. It necessarily follows, therefore, that the nature and extent of the right of a riparian proprietor to the water of a stream for irrigation cannot be measured by any definite or fixed rule, nor can the amount of water to which he is entitled to use for that purpose ordinarily be definitely ascertained or determined, although this may perhaps be done in exceptional cases.

11. It is necessarily a varying quantity, depending upon the use by other proprietors, and whether it is an injury to them. Each case must be decided, as it arises, upon its own particular facts and circumstances. This disposes of the position that defendants Stallard and Robbins have some superior claim to the waters of the

stream because of the priority of their filings. There is another reason why defendant Altnow cannot assert the right to the use of the surplus water of the stream as riparian proprietor. It is the settled law in this state that an appropriator of water from a stream flowing through his premises has not the right as riparian proprietor to the use of the surplus for irrigation as against subsequent claimants: *Low* v. *Schaffer,* 24 Or. 239 (33 Pac. 678) ; *North Powder Milling Co.* v. *Coughanour,* 34 Or. 9 (54 Pac. 223) ; *Brown* v. *Baker,* 39 Or. 70 (65 Pac. 799, 66 Pac. 193).

12. While the doctrine of prior appropriation and riparian rights is not so antagonistic that they may not exist in the same locality (*Crawford Co.* v. *Hathaway,* 67 Neb. 325 : 93 N. W. 781 : 60 L. R. A. 889 : 108 Am. St. Rep. 647), a settler upon a non-navigable stream has an election either to rely upon his rights as riparian proprietor or to make an appropriation of the water if it is free and subject to appropriation, and claim as an appropriator, but he cannot do both.

13. There is considerable evidence in the record upon the question as to whether the permanent maintenance of the dam and reservoir by the defendant will necessarily be an injury to the plaintiff; but we think the proof is not sufficiently clear upon this point to justify a decree requiring him to remove the dam. It is probable that it may be maintained and operated in such a manner as not to injure the plaintiffs, and, if so, defendant is entitled to use it; but he will be enjoined from using any water from the reservoir formed above the dam on the high or bench land west of the creek, when it is needed by plaintiffs or other parties on the stream below him.

A decree will be entered in accordance with this opinion.          MODIFIED.

MR. COMMISSIONER KING, having been of counsel below, did not sit in this case.

Decided October 6, 1908.

## ON MOTION FOR REHEARING.

[97 Pac. 539.]

MR. CHIEF JUSTICE BEAN delivered the opinion.

Neither party is satisfied with the decree heretofore rendered. Plaintiffs claim that the court erred in awarding defendant Altnow a prior right, by appropriation, to 150 inches of water from Warm Springs Creek; and for defendant Altnow it is insisted that the court erred in holding that he could not use the water so appropriated on land west of the creek, when needed by plaintiffs or other parties to the suit, and that Stallard, as riparian owner, is not entitled, as against plaintiffs, to a superior right to use water for irrigating land owned by him and which was filed on prior to the initiation of plaintiffs' rights.

The quantity of water to which Altnow is entitled is measured by the purposes of his appropriation and the amount he put to a beneficial use within a reasonable time thereafter, not exceeding the amount of such appropriation. Upon this point the evidence is not clear. No witnesses testified, with any degree of accuracy, as to the amount of land he had under cultivation and upon which he used the water. The evidence consists of merely the opinion of witnesses, which vary largely. Our best impression, from the entire testimony, was that he is entitled to 150 inches, and a re-examination of the record confirms us in that view. Altnow's position is that he is entitled to use the entire amount of water appropriated by him, if he needs that amount, "anywhere, for any purpose, without reference to any one else, and irrespective of that use upon others." In other words, his claim seems to be that by his appropriation he acquired a prior right to the amount of water appropriated by him, and is entitled to use it at any time or place, provided he needs it and puts it to a beneficial use.

14. But this is not the law as we understand it, if the contemplated change in the use will injuriously affect rights which have been lawfully acquired subsequent to his appropriation. "The right of an appropriator of water," said Mr. Justice FIELD, "is limited in every case in quantity and quality by the uses for which the appropriation is made": *Atchison* v. *Peterson,* 87 U. S. (20 Wall.) 514 (22 L. Ed. 414). Or, as said by Mr. Chief Justice LORD: "The measure of the right of the first appropriation of the water, as to extent, follows the nature of the appropriation, or the uses for which it is taken. The needs or the purpose for which the appropriation is made is the limit to the amount of water which may be taken": *Simmons* v. *Winter,* 21 Or. 35 (27 Pac. 7: 28 Am. St. Rep. 727). And the rule is thus concisely stated by Mr. Chief Justice MOORE: "The appropriation of water to a beneficial use is founded upon the rule of necessity, which, when satisfied, becomes the measure of the right, whereupon subsequent appropriators may use the surplus of that to which the prior appropriator is entitled when not necessary to his use": *Mattis* v. *Hosner,* 37 Or. 523 (62 Pac. 17, 632). There may, therefore, be numerous appropriations of water of the same stream, and for use at different times and seasons, or for different purposes: *McCall* v. *Porter,* 42 Or. 49 (70 Pac. 820, 71 Pac. 976). And after the rights of subsequent appropriators have attached, the prior appropriator cannot change or extend his use to their injury: *Cole* v. *Logan,* 24 Or. 304 (33 Pac. 568) ; *Bolter* v. *Garrett,* 44 Or. 304 (75 Pac. 142) ; *Proctor* v. *Jennings,* 6 Nev. 83 (3 Am. Rep. 240). An appropriator of water, it is true, may change the point of diversion or place of use, so long as he does not thereby injure or affect the rights of others, because in such case they have no ground for complaint. But he cannot extend the use, so as to injure or interfere with subsequently acquired rights.

Altnow's appropriation was made for the purpose of irrigating land east of the stream. By such appropriation he acquired a prior right to water sufficient for that purpose. He did not, however, acquire title to the water, but only the right to use it for the purposes for which it was appropriated. When not needed for that purpose, it was subject to appropriation by others, and he cannot subsequently change or enlarge his use to their injury. The contemplated use by him of water on land west of the stream would, we think, be a material extension of the rights acquired by him as riparian appropriator, and might seriously injure or affect the rights of subsequent appropriators. Of the land owned by Stallari which was filed on prior to the initiation of plaintiffs' rights, but 40 acres (N. W. $\frac{1}{4}$ of S. E. $\frac{1}{4}$ of section 8) are riparian to Warm Springs Creek. The remainder is on Cottonwood Creek, the waters of which, as we understand it, are not in controversy in this suit. As to the land riparian to Warm Springs Creek, as riparian proprietor, his right is superior to the rights of plaintiffs; but there is nothing in the present record by which any definite quantity of water can be awarded, if, indeed, that could be done under any circumstances.

Petitions for rehearing denied.

MODIFIED. REHEARING DENIED.